W. M. Robertson v. Commissioner.
W. Robertson v. Commissioner
Docket No. 9613.
United States Tax Court
1948 Tax Ct. Memo LEXIS 250; 7 T.C.M. (CCH) 62; T.C.M. (RIA) 48020; February 20, 1948
*250 Bad debt. - Claimed bad debt deductions disallowed. Loss. - Held, that petitioner sustained a long-term capital loss in 1942 upon the disposition of shares of beneficial interest acquired in January 1940 in a business trust which was an association taxable as a corporation. Robert S. Eastin, Esq., and W. E. Baird, C.P.A., 701 Fidelity Bldg., Kansas City 6, Mo., for the petitioner. Harlow B. King, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent determined deficiencies against the petitioner, in the amounts of $9,354.61 income taxes for the calendar *251 year 1941 and $2,355.98 income and victory taxes for the calendar year 1943, the latter year including the unforgiven part of petitioner's 1942 tax. The issues presented are whether respondent erred in failing to allow: (1) claimed bad debt deductions of $30,000 for 1941 and $15,036.52 for 1942, or, in the alternative if no debtor-creditor relationship existed, (2) a long-term capital loss in 1942 on an investment in shares of a business trust, or, (3) an operating loss on an enterprise operated by petitioner as a sole proprietor. Various other alternative assignments of error are considered as abandoned since no arguments are made in support thereof. In addition to the testimony and exhibits adduced at the hearing, the proceeding was submitted upon a stipulation of facts with exhibits attached thereto, which stipulation is adopted as a part of our findings of fact and included therein by reference. Findings of Fact The petitioner is a resident of Joplin, Missouri. During the years in question petitioner was the principal stockholder of, and actively engaged in managing, the business of several corporations, namely, two automobile sales companies, an automobile finance company, *252 a public service company, and he was also a director of a bank and of a foundry. Petitioner's individual income tax returns for the calendar years 1941, 1942, and 1943 were made on the cash receipts and disbursements basis and were filed with the collector of internal revenue for the sixth district of Missouri. On his 1941 return petitioner claimed a deduction of $30,000 as a partially worthless debt of the Romo Mining Company, a business trust, which respondent disallowed in full. On petitioner's original return for 1942, filed on March 8, 1943, he claimed a deduction of $25,036.52 as a bad debt of Romo Mining Company, but on his amended return for that year, filed on March 15, 1944, he reduced that claimed deduction to $15,036.52 and respondent did not allow any portion of those amounts as a deduction. Those amounts claimed on the original and amended returns for 1942 were explained in schedules attached to those returns, respectively, as follows: Original Return
Amended Return
Bad Debt: Romo Mining Company
$65,036.52
$65,036.52
Less: Prior Years' Deduction
$30,000
$30,000
Bid on Foreclosure
10,000
40,000.00
20,000
50,000.00
$25,036.52
$15,036.52
*253 On petitioner's 1943 return, filed on March 15, 1944, he reported on the schedule for long-term capital gains and losses that he acquired a lead and zinc mill in 1942 at a cost of $20,000 and sold the same in 1943 for $20,000 and realized no gain or loss thereon. That property was acquired from the Romo Mining Company on a foreclosure thereinafter set out. In determining the deficiency involved herein for the year 1943 respondent made no adjustment as to that item involving the lead and zinc mill and accepted petitioner's return as filed, except that he increased the amount of the unforgiven part of petitioner's 1942 tax from the sum of $2,445.89 as reported by petitioner to the sum of $4,801.87 as includible in his 1943 tax liability. Such increase in the unforgiven part of petitioner's 1942 tax was due to his disallowance of the claimed bad debt deduction. The respondent's disallowance of the claimed bad debt deductions for 1941 and 1942 was on the ground that petitioner had not established either the existence of a debt or the worthlessness thereof. In 1937 petitioner became interested in a lead and zinc mining venture in which Charles A. Malsbury and William L. Owen, both residents *254 of Joplin, Missouri, were jointly engaged. The latter two men had been jointly engaged in mining activities prior to 1937 and in that year they acquired onemining lease and options for other mining leases on certain abandoned mining properties situated in the Lincolnville district of Ottawa County which was one of the oldest lead and zinc mining fields in Oklahoma. They approached petitioner to join in their venture and to finance the dewatering of the old mines, the development costs and the prospective mining operations if ore deposits were found in paying quantities. Petitioner knew the proposition was a highly speculative venture, but thought it might prove profitable and so agreed to join in the venture. On October 30, 1937, Charles A. Malsbury and William L. Owen as first parties, and the petitioner herein as second party, entered into a written contract which is included herein by reference as part of the stipulation and which recites and provides in substance: (a) That the first parties had a contract dated April 20, 1937, with the Bureau of Catholic Indian Missions of Washington, D.C., for a mining lease covering certain described land in Ottawa County, Oklahoma (hereinafter *255 referred to as the Missions lease); that with the approval of the Secretary of the Interior the first parties had an agreement with Christine Shapp et al., owners of certain described restricted Quapaw Indian land also located in Ottawa County (hereinafter referred to as the Shapp land), which agreement provided for a permit for a period of 90 days from October 7, 1937, in which to dewater and inspect the mines thereon and determine whether a lease thereon was desired; that the first parties were negotiated for prospecting permits, leases and contracts on other adjoining land; that the first parties "are partners, having equal interests in such ventures and Second Party is desirous of acquiring an interest in the rights above described" and in such additional mining rights "as may be hereafter acquired" in that territory by first parties; (b) That the second party "shall commence and thereafter carry on de-watering operations" on the Shapp land and complete the same within a prescribed 90 day period; that thereafter all parties shall inspect the mine; that if all the parties "shall jointly agree that mining operations can be so conducted upon a profitable basis" then they shall proceed *256 to form a Missouri or Oklahoma corporation with an agreed authorized capital stock to be issued 3/8 to each of the first parties and 1/4 to the second party (petitioner); that upon organization of such corporation first parties shall transfer and assign thereto all their right, title and interest in and to contracts for leases, mining leases, licenses, options and agreements covering the properties which were in the Lincolnville district and thereafter all additional contracts, leases, and mining rights acquired in that district shall be acquired in the name of the corporation; (c) That upon completion of organization of the corporation and the transfer of the contracts and leases to it, the "Second Party shall immediately procure and furnish to said corporation all necessary and proper equipment to mine property so dewatered by him and shall furnish all necessary moneys to commence and continue such operations," such equipment to include "whatever may be necessary for economic and efficient mining operations" but not the erection of a concentrating plant; that second party "shall at all times keep accurate records of all sums of money expended by him in such mining operations, and *257 the said corporation shall obligate itself to reimburse Second Party for such expenditures from time to time out of the proceeds of mining operations until * * * fully repaid"; that all equipment, machinery and appliances furnished by second party shall be inventoried and valued at cost to him and be deemed to be expenditures to be reimbursed out of profits; that "All profits realized from such mining operations shall be devoted to the reimbursement of Second Party and said corporation shall have no right of claim to any such profits until Second Party shall have been wholly reimbursed for all expenditures so made by him"; that until then second party shall have "sole control and direction" of all the mining operations and none of the parties would be allowed any salary or compensation; (d) That "All equipment, machinery, appliances and personal property placed upon the said lands by Second Party shall become the property of said corporation as soon as Second Party shall have been reimbursed therefor"; (e) That the second party provide proper liability and workmen's compensation insurance and required surety bonds, the cost thereof to be included in expenditures to be reimbursed; *258 that all books, records, and documents relating to the mining operations shall be open to inspection of first parties; and (f) That, "If Second Party shall at any time cease operations upon said lands or shall fail to carry out the terms and conditions hereof in good faith, then the stock so issued to him in said corporation shall be forfeited, and shall become the property of said corporation and Second Party shall have the right to remove from the premises all equipment appliances, and personal property placed thereon by him and which he shall not have been reimbursed; provided, however, that said corporation may at its election within ninety days from such forfeiture, elect to pay to Second Party the balance for which he shall not then have been reimbursed and thereupon title to all such equipment, appliances, and personal property shall vest in said corporation." The contract for a mining lease on the Catholic Indian Missions land referred to in the above-mentioned agreement of October 30, 1937, was actually a 10 year lease dated April 20, 1937, in which Malsbury and Owen were the lessees. Shortly after the execution of the October 30, 1937, agreement, William L. Owen transferred *259 one-half of his interest in the venture to his son, Luther C. Owen, who was employed at a fixed compensation as the superintendent of the actual development and mining operations. Pursuant to the agreement of October 30, 1937, petitioner furnished the necessary funds and equipment for dewatering the old mines, which operation was completed sometime prior to the end of 1937, and after an inspection thereof all the interested parties agreed to embark on the mining operations. However no steps were taken to organize a corporation as set out in the October 30, 1937 agreement and on January 15, 1938, Christine Shapp et al. as lessors and W. L. Owen, L. C. Owen, C. A. Malsbury and W. M. Robertson (petitioner) as lessees, executed an eight year mining lease on the Shapp land, which lease was approved by the Secretary of the Interior on February 10, 1938. Subsequently a third mining lease on certain adjoining land was executed on February 2, 1938, by those same four men as lessees and by certain bankers as lessors. No cash bonus or other payment was made to any of the owners of the land involved in those three leases which were acquired at on cost except for the time and expense involved *260 in the negotiations therefor by Malsbury and Owen. During 1938 and 1939 the mining operations on the leased premises were conducted, generally, in pursuance of the agreement of October 30, 1937, except that in the summer of 1939 and by agreement of all the parties on August 16, 1939, petitioner financed the erection of a concentrating mill and in consideration therefor the other three parties assigned and transferred to him "an additional one-fourth (1/4) interest in the holdings of The Romo Mining Company under the same conditions as set forth in our original contract." During those two years the leases remained in the names of the individual lessees and titled to the equipment and machinery on the properties remained in petitioner's name. During 1938 and 1939 the mining activities were conducted as a partnership business under the name of the Romo Mining Company and pursuant to the October 30, 1937 agreement petitioner furnished all of the funds required for such activities, including the dewatering, the development costs, the purchase of equipment, and the cost of production and sale of ore and also the cost of labor. The original dewatering costs were paid directly by petitioner *261 and thereafter petitioner deposited funds in a bank account in the name of the Romo Mining Company and drew checks thereon for all expenditures incurred in the development and mining operations. From the time the parties decided to carry on the mining operations, the costs were recorded in a set of accounting records maintained during those years, under the name of the Romo Mining Company, and such records showed, as of December 31, 1939, a credit balance of $39,041.88 to petitioner on account of all monies furnished by him from October 30, 1937 to December 31, 1939. The mining operations for those two years, after charging off some development expenses, showed losses amounting to $4,284.28 and $11,394.62, respectively, or a total of $15,678.90. Income received from the sale of lead and zinc ore was not sufficient to pay the operating costs and the funds furnished by petitioner were used to pay the operating deficits as well as for development work and purchase of equipment. In the partnership income tax returns filed under the name of the Romo Mining Company for each of the years 1938 and 1939, the losses for those years were divided or allocated to the individuals, as follows: *262 1938
1939
W. M. Robertson
$1,071.07
$ 5,697.31
Charles A. Malsbury
1,606.61
2,848.65
William L. Owen
803.30
1,424.33
Luther C. Owen
803.30
1,424.33
Total loss per partnership
returns, Form 1065
$4,284.28
$11,394.62 The petitioner included the losses of $1,071.07 and $5,697.31 in his individual income tax returns for 1938 and 1939, respectively. After completion of the concentration mill in the latter part of 1939, the four partners decided they should incorporated the business pursuant to their October 30, 1937 agreement, but they were advised by legal counsel to form instead on Oklahoma business trust. On January 22, 1940, W. L. Owen, L. C. Owen, C. A. Malsbury and W. M. Robertson as subscribers and W. L. Owen, C. A. Malsbury and W. M. Robertson as trustees, executed a declaration of trust, part of the stipulation and which provides in substance: (a) That the subscribers transfer, assign, and deliver to the trustees, under the designation of the Romo Mining Company, the three above-mentioned mining leases on lands located in Ottawa County, Oklahoma, and also the concentrating mill and all other personal property located thereon; that the trustees *263 issue to the subscribers negotiable certificates representing their beneficial interests or shares in the trust estate, to the amount of $40,000 common beneficial interests of the expressed par value of $100 per share, fully paid and nonassessable, and transferable on the books of the trustees; and that the trustees hold such property and any later acquired property together with the proceeds, income, and profits thereof, in trust, to manage and dispose of same, under the name of the Romo Mining Company, for the benefit of the holders of certificates. (b) That the trustees are authorized, empowered, and directed to use the trust estate to engage in the business of acquiring real property or mineral rights therein, of prospecting for lead, zinc, and other minerals and oil and gas, of developing and operating mines, of milling and selling ores, of acquiring machinery and equipment, and, further, to exercise all powers necessary or convenient in the conduct and management of the business. (c) That the board of trustees, elected annually, is authorized, inter alia, to adopt and use by-laws for the conduct of the business and to provide for a president, secretary, and treasurer; to *264 make and execute contracts in the name of the Romo Mining Company; to borrow money, give obligations therefor, and create liens upon the trust property; to collect interest, income, and profits from the business operations or stocks or securities owned by the trust and in general to do all things necessary to promote the business; and, further, that neither the trustees nor certificate holders shall be personally liable for any liability oo the trust whatsoever. (d) That the beneficial certificates be in a specified form setting forth the number of shares of $100 par value each, owned in the Romo Mining Company, a business trust, subject to the terms of the declaration of trust; that the owner is entitled to such distribution of the profits of the trust as the trustees may declare and to participate in the distribution of the trust estate upon termination thereof; that the trust capital and estate of the Romo Mining Company is fixed at $40,000 divided into 400 shares of the par value of $100 each; that the certificate owner is not liable for the debts of the trust and its shares are not subject to assessment; and that the certificate is transferable only on the books of the trust *265 on surrender of the certificate properly indorsed. (e) That the earnings and surplus accumulated by the trustees from the operation of the business shall become a part of the corpus of the trust, but the trustees may from time to time in their discretion make such distributions from earnings and surplus to the stockholders as they may deem expedient; such distributions to be made to the shareholders pro rata according to the number of shares held by each. (f) That the ownership of shares in the trust shall not vest in the shareholders any title in or to the trust property or right to call for a partition or for an accounting; that death of a shareholder shall not terminate the trust; and that all persons having any claims against the trustees shall look only to the funds and property of the trust for payment. (g) That the trust shall continue for a term of 20 years; that the company seal bear the words of "Romo Mining Company" and "A Business Trust"; and that the filing of the declaration of trust for record in the office of the County Clerk of Ottawa County, Oklahoma, shall be conclusive of the trustees' acceptance of the terms of the agreement under which the business trust *266 has been organized under the laws of the State of Oklahoma. The trust instrument was signed by the four subscribers and the three designated trustees on January 22, 1940, and was filed for record in the office of the County Clerk at Miami, Ottawa County, Oklahoma, on February 14, 1940. A general assignment of title, free of all liens or incumbrances, in and to the concentrating plant and all other personal property located on mining property involved, to the Romo Mining Company, a business trust, was executed by William L. Owen, Luther C. Owen, Charles A. Malsbury, and W. M. Robertson on January 22, 1940. On the same date, those same four parties executed an assignment of their right, title, and interest in mining leases for certain described property in Ottawa County, Oklahoma, to the Romo Mining Company, a business trust, which assignment was recorded on February 14, 1940. Also, on January 22, 1940, the board of trustees of the Romo Mining Company held a meeting at which Charles A. Malsbury was elected president, William L. Owen was elected vice-president, and W. M. Robertson was elected secretary-treasurer; the abovementioned assignments were accepted; and the issuance of shares *267 to the subscribers was authorized and directed. Such shares were subsequently issued in the following amounts and in proportion to each subscriber's prior partnership interest: W. M. Robertson
1/2 interest, or 200 shares
Charles A. Malsbury
1/4 interest, or 100 shares
William L. Owen
1/8 interest, or 50 shares
Luther C. Owen
1/8 interest, or 50 shares
On his 1940 return petitioner reported no gain or loss on that transaction. The interested parties treated the declaration of trust as having been effective as of January 1, 1940. As of that date and in financing the partnership business, petitioner had furnished a total of $39,041.88 in meeting deficits in expenses of operations and for the cost of capital assets consisting of equipment, etc., used in the business. The partnership operating losses for 1938 and 1939 amounted to $15,678.90 and the balance, or $23,362.98, of petitioner's expenditures represented the cost of the mining equipment, concentration mill, and other personal property to which petitioner held title and which he transferred to the business trust in January 1940. The petitioner's original cost in January 1940 of his 200 shares in the business *268 trust was at least $23,362.98. Immediately upon execution of the trust instrument the Romo Mining Company, a business trust, commenced business and it opened its books as of January 1, 1940. A summary of the closing balance sheet of the predecessor partnership known as the Romo Mining Company and the opening balance sheet of the Romo Mining Company, a business trust, is as follows: Romo Mining Company
Romo Mining Company
(a Business Trust)
Closing 1939
Beginning 1940
ASSETS
Current Assets
Cash
$ 174.34
$ 174.34
Accounts Receivable
325.00
$ 499.34
325.00
$ 499.34
Fixed Assets
Equipment
20,877.27
20,877.27
Development
8,639.98
8,639.98
Deficit
Year 1938
$ 4,284.28
Year 1939
11,394.62
15,678.90
Leases: Capital stock
$40,000.00
Deficit
15,678.90
55,678.90
Deferred Assets
579.48
579.48
Total Assets
$46,274.97
$86,274.97
LIABILITIES
Capital
$40,000.00
W. M. Robertson
$39,041.88
39,041.88
Notes and Accounts Payable
7,233.09
7,233.09
$46,274.97
$86,274.97
On February 21, 1940, and pursuant to an authorization voted at a meeting of the board of *269 trustees on the same date, the Romo Mining Company, an Oklahoma business trust, through its president, as the first party, and W. M. Robertson, as the second party, entered into a written agreement which is included herein by reference as part of the stipulation and which sets forth in substance: (a) That, whereas, the Romo Mining Company "previously operated as a Co-Partnership" under the agreement of October 30, 1937, "by the terms of which W. M. Robertson is advancing all the money to drain, develop and mine certain leases therein described, and the profits accruing from such operations are therein pledged by the Co-Partnership to reimburse W. M. Robertson for all moneys so advanced" before the other co-partners participate in such profits; whereas, Robertson "has advanced also the money to purchase, build and equip a mill" and where by mutual agreement of all the parties at interest, "an Oklahoma Business Trust has been formed to do business under the name of The Romo Mining Company, and as such, has taken over the assets and liabilities of the above mentioned Co-Partnership", it is agreed, (b) That second party shall keep accurate records of all sums of money expended by him *270 in such mining operations and the "First Party hereby obligates itself to reimburse Second Party for such expenditures from time to time out of the proceeds of mining operations" until fully repaid; that all equipment, machinery, and appliances shall be inventoried at cost for such reimbursement; that the "Business Trust shall have no right or claim to any such profits" from such mining operations until second party shall have been wholly reimbursed; that all such mining operations "shall be under the sole control and direction" of second party until he is fully reimbursed and that until such reimbursement none of the parties shall be allowed any salary or compensation. (c) That first party "affirms its continuation of the Co-Partnership pledge to Second Party of mining profits" for his reimbursement and agrees to further secure him therefor by execution and delivery of a chattel mortgage "covering concentrating plant and all other equipment belonging to The Romo Mining Company"; and that second party agrees that when fully reimbursed either from profits from mining or from proceeds of sale of any of the Romo Mining Company properties, "he will at that time cancel the said note & *271 chattel mortgage". On February 28, 1940, the Romo Mining Company by its president, Charles A. Malsbury, executed a promissory note, payable to W. M. Robertson, in the principal sum of $50,000, on the 28th day of February 1942, with interest from maturity at 6 per cent per annum, and secured by a chattel mortgage executed by that company on all its personal property located on the leased premises of the trust. The note and chattel mortgage were given to petitioner as additional security for reimbursement of his advances in financing the venture because under the original agreement of October 30, 1937 he was to retain title to the equipment and other personal property until reimbursement, but, on January 22, 1940, title to all the equipment and personal properties had been transferred to the trust. On February 28, 1940, petitioner's advances in financing the venture totalled $41,484.88, but the note was made in the amount of $50,000 so as to include therein additional funds contemplated to be furnished by petitioner for the erection of a floatation plant. The petitioner remained obligated to finance the venture or forfeit his interest therein pursuant to the parties' original agreement *272 of October 30, 1937, which constituted the basic agreement between those parties and, except in such respects as it was modified by the instruments executed subsequent thereto, it continued in force throughout petitioner's participation in the venture. After the organization of the business trust in January 1940 the actual operation of the mines on the leased premises was continued in the same manner as it had been therefore conducted, including exploratory and development work, purchase of equipment, production of ore, etc., and during 1940, 1941, and part of 1942 petitioner continued to furnish the necessary funds for such operations. During petitioner's participation in the venture from October 30, 1937 to 1942, inclusive, he furnished funds in connection with the original exploratory dewatering of the old mines, the operation of the partnership business and the operation of the business trust, in the following amounts: October 30, 1937 to December 31, 1938
$18,282.88
January 1, 1939 to December 31, 1939
20,759.00
Total to December 31, 1939
$39,041.88
January 1, 1940 to February 28, 1940
2,800.00
Total to February 28, 1940, at which time a $50,000.00 note and mortgage was
issued to petitioner by The Romo Mining Company
$41,841.88
February 28, 1940 to December 31, 1940
8,775.00
Total to December 31, 1940, carried in balance sheet of The Romo,mining Com-
pany as note for $50,000.00 and advances by stockholder, W. M. Robertson,
$616.88
$50,616.88
January 1, 1941 to May 31, 1941
9,000.00
June 1, 1941 to December 31, 1941
1,350.00
Total to December 31, 1941
$60,966.88
January, February, and March, 1942
2,800.00
Total funds furnished by petitioner to March 31, 1942
$63,766.88
Funds furnished by petitioner from April to July 1942, regarding using
milling equipment for custom milling, the facts regarding which will be
shown by other evidence
1,271.64
Total funds furnished by petitioner
$65,038.52
*273 For the years 1940 and 1941 the Romo Mining Company filed income tax returns, form 1120, as a business trust engaged in the business of lead and zinc mining and reported a net loss for each year. The financial operations of the Romo Mining Company as shown by its accounting records for the years 1940, 1941, and 1942 are summarized as follows: 1940
1941
1942
Gross Receipts
$51,675.11
$42,803.88
$5,525.84
Cost of Operations, including labor, supplies, roy-
alties, milling, exploration and development, etc.
44,345.36
41,265.40
7,262.28
$ 7,329.75
$ 1,538.48
($1,736.44)
Miscellaneous income, including royalties
28.66
48.89
126.46
Total Income or Loss
$ 7,358.41
$ 1,587.37
($1,609.98)
Deductions, including taxes, depreciation, depletion,
office salaries and expenses, insurance, etc.
11,373.19
8,603.30
295.65
Net Loss
($ 4,014.78)
($ 7,015.93)
($1,905.63)
The balance sheets of the Romo Mining Company as shown by its accounting records as of December 31, 1940, 1941, and 1942 are summarized as follows: Dec. 31,
Dec. 31,
Dec. 31,
1940
1941
1942
ASSETS
Current Assets
$ 2,260.48
$ 723.57
$ 1,408.79
Equipment, less depreciation
20,594.62
24,458.00
67.50
Leases and development
67,696.86
69,053.22
69,053.22
Deferred assets
616.56
564.43
169.86
Total Assets
$91,168.52
$94,799.22
$70,699.37
LIABILITIES
Accounts payable
$ 3,646.00
$ 4,079.76
$ 2,417.03
Mortgage payable
50,000.00
50,000.00
Advances by stockholder
616.88
10,966.88
15,038.52
Tax reserve
673.39
92.78
12.72
Insurance reserve
247.03
690.51
557.94
Capital stock
40,000.00
40,000.00
40,000.00
Surplus or Deficit
(4,014.78)
(11,030.71)
14,578.79
Net Loss for 1942
(1,905.63)
Total Liabilities
$91,168.52
$94,799.22
$70,699.37
*274 During 1939 a shaft developed on the Missions lease gave promise of a good body of ore and as a result the concentrating mill was erected in the summer of 1939 just prior to the organization of the business trust as of January 1, 1940. During 1940 the mining operations and development of bodies of ore seemed to justify the outlay of funds expended for a flotation plant. In February 1941 the Romo Mining Company entered into an agreement giving certain persons an option to sell its leases and equipment for a total sale price of $140,000, out of which a commission of $20,750 would be paid; however, no sale was made under that option. In September 1941, a fairly rich body of ore was mined out and exploratory drilling in various directions had not developed new deposits in commercial quantities; also a tunnel cave-in at one place made further mining operations at that place too expensive and too dangerous for the workmen for further operation. Also in September 1941 the price of lead and zinc ore was frozen by the Government at a price which, together with the then existing conditions at to the mining operations and the losses sustained in each year's operations from the beginning up *275 to that time, caused petitioner and the other interested parties to decide that the Romo Mining Company's properties could not be operated at a profit so operations ceased and the mines were closed. Thereafter the Romo Mining Company did not operate the mines again. In 1942 the Romo Mining Company received small amounts of royalties from some operators who conducted limited operations on the properties in shallow mines only 15 to 20 feet deep and above the level of the water which filled the deeper shafts and tunnels after the company ceased operating pumps. That company also conducted some custom milling operations at a loss. In March 1942 petitioner as required by Oklahoma Law published a notice of a chattel mortgage foreclosure and sale at public auction on March 19, 1942 of all the Romo Mining Company's equipment, mill, and other personal property for the purpose of satisfying the note secured by such chattel mortgage. At the auction sale there were no bidders other than the petitioner who bid such personal property in for $10,000. At that time such property had a total value of at least $20,000. The leases remained the property of the Romo Mining Company. The petitioner foreclosed *276 the chattel mortgage in order to secure title to the equipment, mill, and other personal property in his own name as originally agreed. Thereafter for a few months the mill was operated by the Romo Mining Company for custom milling and in connection therewith petitioner furnished funds totalling $1,271.64 during April to July 1942, but that operation resulted in a loss. During 1942 the Government adopted a policy of subsidy payments in place of any increase in the basic stabilized price then obtaining for lead and zinc and also made provision for loans for the operation of certain submarginal lead and zinc mines. Willian L. and Luther C. Owen were desirous of borrowing funds to dewater the mines on the Romo Mining Company leases and to attempt to operate the mines again. However, by December 1942 petitioner determined that he was through with the venture because of his losses thereon and, also, that his certificate of shares in the Romo Mining Company had no value. On December 11, 1942 he indorsed such certificate in blank and without any consideration therefor transferred it to William L. and Luther C. Owen and such transfer was considered by the parties to be in accordance with *277 the original agreement of October 30, 1937, that petitioner would forfeit his interest in the venture if he discontinued advancing funds for mining operations. At the same time Malsbury also transferred his certificate of shares in that company to the two Owens without consideration therefor. On the same date, petitioner and Malsbury resigned as trustees and as secretary-treasurer and president, respectively, of the Romo Mining Company. After such transfer of his certificate of shares in the Romo Mining Company petitioner agreed to rent to that company the concentration mill on a 20" a ton basis, and the two Owens or the company borrowed $5,000 and started dewatering the mines, but the company never got into mining operations. At some later date in 1943 the leases were sold to Cameron and Henderson, Inc., a mining company, for $10,000. In March 1943 petitioner sold all the mining equipment, mill, and other personal property acquired at the above-mentioned foreclosure to Cameron and Henderson, Inc., for $20,000, and on his individual return for 1943 he reported on the capital gains and losses schedule that he acquired such property in March 1942 at a cost or other basis of $20,000 *278 and sold it in March 1943 at a price of $20,000 with no gain or loss on the transaction. Under the agreement of October 30, 1937, the petitioner and his associates intended to create and did create a relation of partners in a joint mining venture as to which petitioner agreed to furnish all necessary financing and to look only to the profits realized for reinbursement of his investment in the venture or if no profits were realized then only to the capital assets in the form of the equipment and other personal property acquired for use in the business but title to which was to be held in his name. Under that agreement no debtor-creditor relation was created between petitioner's associates individually or the partnership and the petitioner with respect to any portion of the $39,041.88 which he expended in financing the venture up to December 31, 1939. When the partnership ceased operation as of January 1, 1940, the petitioner's expenditures in financing it were represented by its operating losses sustained in the total amount of $15,678.90 and by the personal assets costing $23,362.98 and to which he then held title. Under the trust instrument of January 1940 the petitioner and *279 his associates intended to create and did create a trust to carry on the business of the mining venture in a form analogous to that of a corporation. The leases held in the names of individual lessees, the personal properties held in petitioner's name, and certain other partnership assets and liabilities were transferred to the business trust in exchange for shares of beneficial interest in proportion to the prior partnership interests. The trust instrument did not create, and was not intended by the parties to create, a debtorcreditor relation between the trust and petitioner on account of his prior financing of the predecessor partnership. The subsequent agreement of February 21, 1940 operated only to restore certain basic agreements of the interested parties as expressed in their original contract of October 30, 1937, namely, that petitioner was to continue financing the venture or forfeit his interest therein, was first to look to profits for reimbursement of his investment, and was to be given a chattel mortgage so that if no profits were realized he could acquire title to the equipment, mill, and other personal property for which his funds had been expended. Neither the trust *280 instrument nor the February 21, 1940 agreement created a debtor-creditor relation between the business trust and the petitioner. The 200 shares in the business trust had an original cost basis of $23,362.98 to petitioner when issued in January 1940. Thereafter, through financing the trust's business, he invested an additional $25,996.64 in the enterprise, but in March 1942 he foreclosed the chattel mortgage and acquired the equipment, mill, and other personal property which had a value of $20,000 at that time. Petitioner disposed of his 200 shares in the business trust on December 11, 1942 for no consideration and sustained a loss thereon of $29,359.62. Opinion The basic questions in the proceeding are what type of loss or other deduction petitioner is entitled to, the amount thereof, if any, and the year or years in which deduction, if any, should be allowed on account of petitioner's advancements totalling $65,038.52 in financing the mining venture conducted in the manner set out in our findings of fact. Petitioner argues that his claimed bad debt deductions in the amounts of $30,000 for 1941 and $15,038.52 for 1942 should be allowed on the ground that all his advances *281 constituted loans, first to the partnership and later to the business trust, but if not, then in the alternative, that his advances constituted an investment in the capital stock of the business trust or an investment of petitioner as a sole proprietor owning the equipment, mill, etc., and operating the Romo mines on the premises under lease to the business trust. On brief the respondent contends that his determination of disallowing the claimed bad debt deductions for 1941 and 1942 should be sustained on the ground that the petitioner's advances were not loans and no debtorcreditor relationship existed between petitioner and his associates or the partnership, or, between the petitioner and the business trust. However, respondent now admits that petitioner has sustained a loss on a mining venture entered into with the expectation of profit, but he questions the sufficiency of the evidence for a proper determination as to the amount, the year in which deductible, and whether allowable as a long-term capital loss or a loss resulting from a transaction entered into for profit not connected with petitioner's regular trade or business. Our conclusions herein must be controlled by the *282 legal relation intended to be created and actually created by the agreements of the interested parties to the mining venture. The written agreement of October 30, 1937 is admittedly the basic agreement between those interested parties and continued in force throughout petitioner's participation in the venture, except as modified by the subsequent agreements. In our opinion that agreement of October 30, 1937 as carried out was intended to and did create between petitioner and his associates the legal relation of partners in a joint undertaking whereby those associates made a capital contribution of the leases or contracts for leases which their efforts alone had obtained and petitioner agreed to risk, as his capital contribution to the venture, the funds required to finance that joint undertaking. Cf. United States v. E. A. Landreth, et ux, 164 Fed. (2d) 340 (5 C.C.A., Dec. 4, 1947). Under that agreement there was no unconditional obligation of any of petitioner's associates or of the partnership to repay petitioner the funds he advanced and it is clear that the parties did not intend to create and did not create a debtor-creditor relationship and we have so found as *283 a fact. What the parties did intend and so provided in their agreement, was that the profits, if any, of the venture would be used first for reimbursement of the petitioner's advances and thereafter the profits would be divided pursuant to each party's respective percentage interest in the venture. Further the parties intended that if there were no profits the petitioner would lose the capital he had risked in the venture, except for what he might recoup on the equipment and other personal property as to which he took title in his own name for that purpose. The joint venture conducted as a partnership continued through 1938 and 1939 resulting in a net loss for each year and by the end of the latter year petitioner had furnished a total of $39,041.88, of which $15,678.90 made up the operating deficits of the partnership which was not a taxable entity and the remaining $23,362.98 was invested in the equipment, mill, and other personal property used in the venture but to which petitioner held title. On January 22, 1940, but treated as being effective as of January 1, 1940, the interested parties executed an instrument setting up an Oklahoma business trust which constituted an association *284 taxable as a corporation since the trust was created as a medium for carrying on a business enterprise and sharing the profits in a form analogous to a corporate organization and since the trust indenture provided for a continuing body or entity during the term of the trust, for a centralized management, for continuity of the enterprise secure from termination or interruption by the death of owners of beneficial interests, for the transfer of beneficial interests represented by shares without affecting the continuity of the enterprise, and for the limitation of personal liability of the participants to the property risked in the undertaking. Morrissey v. Commissioner, 296 U.S. 344. The mining leases, then in the names of the individual lessees, the mining equipment, mill, and other personal property to which petitioner then held title and certain assets and liabilities of the partnership were transferred to the business trust which issued beneficial shares to each participant in proportion to his former partnership interest. No particular value was ascribed to any of the property so transferred. The petitioner received a one-half interest or 200 shares representing his *285 capital investment in the undertaking and he reported no gain or loss for the year 1940 on that transaction. The trust did not assume an unconditional obligation to repay petitioner any portion of the funds he had furnished in financing the mining enterprise up to that time and no debtorcreditor relationship with respect thereto was created between the trust and petitioner and we have so found as a fact. However, the parties realized that the trust indenture had modified their primary intentions, as evidenced by the basic agreement of October 30, 1937, that petitioner should furinsh all the funds required to finance the venture or forfeit his interest therein, that he was to have first claim on the profits of the venture for reimbursement of his investment, and also that he was to hold title to the mining equipment and personal property until paid for out of profits. In rectification of that situation the trust and petitioner entered into the agreement of February 21, 1940, whereby petitioner agreed to continue to finance the undertaking carried on by the business trust and the trust affirmed its continuation of the former partnership agreement that any profits therefrom would be *286 used first to reimburse petitioner and the trust also agreed to further secure such reimbursement by executing a chattel mortgage covering the equipment, concentration mill, and other personal property on the leased premises. The agreements of record clearly evidence the fact that the trust's note for $50,000 secured by the chattel mortgage, both dated February 28, 1940, was not intended to create or evidence a debtorcreditor relationship between the trust and the petitioner in regard to the total amount of $41,484.88 which petitioner had furnished in financing the venture from October 30, 1937 up to the date of the note, plus additional funds it was then contemplated he would be required to furnish for a flotation plant the parties desired to erect. In the light of all the agreements of the parties we do not regard the giving of the note and chattel mortgage as a controlling fact in the disposition of this case, Cf. Wilbert Mineral Corporation, 38 B.T.A. 355, 365, for the intention of the parties was merely to put the petitioner in the position of being able to take title to the equipment, mill, and other personal property or the proceeds from the sale thereof as partial *287 reimbursement of his investment in the undertaking and in keeping with the terms of the original agreement of October 30, 1937. The agreement of February 21, 1940 did not create a debtor-creditor relation between the trust and petitioner and we have so found as a fact. The additional funds in the total amount of $25,996.64 furnished by petitioner after organization of the business trust in January 1940 and up to July 1942 constituted additional investment on his part in the mining venture and in our opinion may be ascribed only to an additional cost of his 200 shares in the business trust, as both parties herein contend either directly or alternatively. However, they are not in agreement as to petitioner's original cost of those 200 shares in January 1940, the respondent contending for a figure of $23,362.98 and petitioner contending for a figure of $24,318.88. We have found as a fact that petitioner's original cost was $23,362.98. Accordingly petitioner's cost basis of his 200 shares amounted to $49,359.62 less $20,000, representing the value of the personal property assets he acquired by foreclosure in March 1942, or $29,359.62. In December 1942 petitioner determined that his *288 shares had no value and that he would cease financing the venture and, pursuant to his agreement with his associates that in the latter event he would forfeit his interest in the venture, he transferred his shares to the two Owens without consideration on December 11, 1942. Such transfer closed the petitioner's transaction with respect to such shares which he had acquired in January 1940 and he sustained a loss thereon in the amount of $29,359.62. Since no debtor-creditor relation existed between the business trust and petitioner during either 1941 or 1942 on account of the funds furnished by petitioner to finance the mining business of the predecessor partnership or the trust, we sustain the respondent's determination in disallowing the claimed bad debt deduction of $30,000 for 1941 and $25,036.52 for 1942. However, respondent erred in failing to allow petitioner a proper deduction on account of his loss sustained in the amount of $29,359.62 upon his disposition in 1942 of 200 shares of beneficial interest in the business trust, Romo Mining Company, which was an association taxable as a corporation. We hold that such shares, which were acquired by petitioner in January 1940 constituted *289 a capital asset within the meaning of section 117 (a) (1), Internal Revenue Code, that such capital asset having been held for more than six months the loss sustained upon the disposition thereof on December 11, 1942 constituted a long-term capital loss, and that the deduction for such loss (under section 23 (g) of the Code) is limited to the extent provided in section 117 of the Code and more particularly subsections (b); (d) (2); and (e) (1) thereof. Having concluded that the mining venture was in the first instance that of the partnership and thereafter of the business trust, it necessarily follows that it was not conducted by petitioner as a sole proprietor, as alternatively contended by him. Petitioner's tax liability for the years 1941, 1942, and 1943 will be recomputed in accordance herewith in a Rule 50 recomputation. Decision will be entered under Rule 50.